# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                  CASE NO: 8:23-cr-474-CEH-UAM

JIMMIE C. GARDNER

---

## ORDER

This matter comes before the Court on three motions filed by Defendant Jimmie Gardner: Motion to Dismiss (Selective Prosecution) (Doc. 160); Motion to Disqualify (Doc. 161); and Motion to Dismiss (Spoliation) (Doc. 162). The Government has responded in opposition. Docs. 163, 166, 164.

A hearing was held on January 17, 2025, at which the Court made oral rulings on the motion to disqualify and motion to dismiss based on selective prosecution. *See* Doc. 169. This Order serves to memorialize the Court's oral pronouncements as to those motions.

With respect to the motion to dismiss based on spoliation, the Court held an evidentiary hearing on February 26, 2025. Upon full consideration, the Court concludes this motion is also due to be denied.

## I.    BACKGROUND

Gardner is charged with one count of sex trafficking of a minor under 18 U.S.C. § 1591, based on the allegation that he solicited a 16-year-old, Y.H., to engage in sexual conduct in exchange for money. The Government alleges that on November 17, 2023,

Gardner picked up Y.H. in his car and took her back to his hotel, where he attempted to pay her for a sexual act. When she declined, they argued and he physically attacked her; she escaped and called the police. Video surveillance depicts Gardner and Y.H. entering the hotel together. Gardner and Y.H. have different accounts of the events inside the hotel room and whether Y.H. told him her correct age.

Gardner's arrest was covered by the media, which noted that he is married to a federal judge who is the sister of a well-known Georgia politician, and that in 2016 he was exonerated of a wrongful conviction for rape after serving 27 years in prison. Gardner was originally charged with the state offenses of Lewd or Lascivious Touching of a Minor and Battery. After AUSA Courtney Derry saw the media coverage of his arrest, within two days the Government initiated a federal prosecution.

Gardner was indicted for one count of Sex Trafficking of a Minor under 18 U.S.C. § 1591(a)(1). Doc. 23. The Superseding Indictment alleges that he patronized or solicited Y.H. to engage in a commercial sex act, while having had a reasonable opportunity to observe her and knowing and in reckless disregard of the fact that she had not attained the age of 18. Doc. 113.

It is undisputed that Y.H. has engaged in prostitution in the past. The Court previously ruled *in limine* that Gardner would be permitted to cross examine her about past occasions when she has lied about her age, but that cross examination about conversations in which she solicited other men for sex was barred under F.R.E. 412. Doc. 128.

## II.    MOTION TO DISMISS - SELECTIVE PROSECUTION (Doc. 160)

In the first motion to dismiss, Gardner argues that he is being selectively prosecuted by the federal government because of his race. Doc. 160.  Two other adult men were arrested for soliciting Y.H. for prostitution, but neither of them was prosecuted by the federal government.  Specifically, in March and April 2024, each man was arrested after picking her up in his car and agreeing to a price for a sexual act.  One of the men has a prior arrest for soliciting prostitution, and his arrest for the conduct with Y.H. garnered media attention.  The other man's arrest resulted from an argument with Y.H. about a payment, under similar circumstances to the allegations against Gardner.  Both of those men are white, while Gardner is Black.  Gardner requests discovery and an evidentiary hearing into his claim of selective prosecution.

The Government responds that Gardner has not established selective prosecution because there are key differences between Gardner's case and the other men's cases. Doc. 163.  Neither man was accused of physically assaulting her, and neither incident took place in the interstate commerce location of a hotel.  Neither man was prosecuted in state court.  Finally, neither of the men is a high-profile individual like Gardner.  Due to these differences, the Government argues, neither is similarly situated to Gardner.

Although federal prosecutors enjoy "'broad discretion' in enforcing criminal laws and a 'presumption of regularity' attaches to their prosecutorial decisions," those decisions "may not be based on an unjustifiable standard such as race, religion, or

other arbitrary classification." *United States v. Cannon*, 987 F.3d 924, 936-37 (11th Cir. 2021), quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

The defendant's burden in proving selective prosecution is "demanding." *Armstrong*, 517 U.S. at 463. He must show, with "clear evidence," that "the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* at 464-65. To establish a discriminatory effect based on race, he must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 465. A similarly situated person "is one who engaged in the same type of conduct as the defendant, in substantially the same manner, and against whom the evidence was as strong or stronger than against the defendant." *United States v. Smith*, 231 F.3d 800, 810-11 (11th Cir. 2000). To warrant discovery in a selective prosecution claim, the defendant must produce "some evidence tending to show the existence" of discriminatory effect and intent. *Armstrong*, 517 U.S. at 468-69.

Here, Gardner has failed to present evidence that Gardner's prosecution is based on his race. Enough differences exist between the three cases that the other men do not qualify as similarly situated. In particular, the Government's choice to prosecute a high-profile individual instead of a lower-profile individual because of the general deterrent effect of prospective media attention is permissible. The Eleventh Circuit has noted that it "does not offend the Constitution when a prosecutor considers the potential deterrent effect of a case's prosecution." *United States v. Brantley*, 803 F.3d 1265, 1274 (11th Cir. 2015). The *Brantley* court approvingly cited *United States v.*

*Catlett*, 584 F.2d 864, 868 (8th Cir. 1978), which held that prosecutors could lawfully consider the deterrent effect of prosecuting those who are likely to receive the attention of the media. *See also United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) ("potential media attention can serve as a legitimate reason for singling out certain individuals rather than others for prosecution"). Relying on *Catlett*, one court in the Middle District of Florida has found that two individuals were not similarly situated for the purpose of a selective prosecution analysis where the defendant was a well-known movie star whose prosecution "attracted considerable publicity." *United States v. Snipes*, No. 5:06-cr-22, 2007 WL 2572198, *3 (M.D. Fla. Sept. 5, 2007). The Government's permissible decision to prosecute a higher-profile person like Gardner does not demonstrate racial discrimination. Additionally, the fact that Y.H. did not allege a physical assault by the other men or that she was in fear for her life with them is another significant distinction between the cases.

Because Gardner has not produced "some evidence" tending to show the existence of discriminatory effect and intent, *Armstrong*, 517 U.S. at 468-69, he is not entitled to discovery into his claim of selective prosecution, and his motion to dismiss is due to be denied.

## III.    MOTION TO DISQUALIFY AUSA COURTNEY DERRY (Doc. 161)

Next, Gardner seeks to disqualify AUSA Courtney Derry due to what he alleges is specific prejudice against him. Doc. 161. In addition to the selective prosecution argument addressed *supra*, he argues that she failed to turn over the recording of a forensic interview of Y.H. for ten months after his arrest, failed to preserve a map that

Y.H. drew during that interview, and made a false statement to the magistrate court about the sequence of events regarding the return of Y.H.'s cell phones. The Government responds that none of these alleged actions violated any professional rules or standards or caused Gardner prejudice. Doc. 166. With respect to the statement to the magistrate court, the Government argues that an inadvertent misstatement does not constitute misconduct.

Federal prosecutors are prohibited from representing the Government in any matter in which they, their family, or their business associates have an interest. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987). By statute, an assistant United States Attorney should be disqualified "from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof." 28 U.S.C. § 528. However, "a stronger showing of a conflict is generally required for prosecutorial recusal than judicial recusal." *United States v. Isaacson*, 752 F.3d 1291, 1308 n.11 (11th Cir. 2014). The Tenth Circuit has described the disqualification of "Government counsel" as a "drastic measure" that Courts should "hesitate to impose…except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (quotation omitted).

Gardner has not established that the drastic remedy of disqualification is warranted. He has made no showing that Ms. Derry violated any professional rules or standards, committed misconduct, or has the appearance of an improper interest in

this case, let alone a specific bias.  Because no basis exists to disqualify her, the motion is due to be denied.

## IV.    MOTION TO DISMISS – SPOLIATION (Doc. 162)

### A. Parties' Arguments and Factual Background

Lastly, Gardner seeks dismissal based on the Government's alleged failure to preserve data from Y.H.'s cell phones.  The police extracted data from two of Y.H.'s phones on the night of Gardner's arrest, then returned the phones to her.  Gardner's expert witness opines that the extractions do not contain the full contents of one of the phones.  Because the phones were returned, the full data is no longer available.  Gardner argues that the Government's failure to preserve it denies him due process, and that the failure to disclose the unpreserved data constitutes a *Brady* violation.  Gardner emphasizes that Y.H.'s credibility is central to the case, so any communications that she made about the alleged offense, and any instances in which she lied about her age, are material and exculpatory to the defense.

In response, the Government disputes Gardner's contention that law enforcement did not turn over a complete extraction of both phones. Doc. 164.  But, in any event, the Government argues that he cannot show that additional data from the phone would be relevant and non-cumulative, that it would not be comparable to what he already has, or that any bad faith existed on the part of law enforcement.  The Government contends that the police extracted data from Y.H.'s phones without an obligation to do so or an expectation that it would produce relevant evidence regarding the offense.

The Court held an evidentiary hearing on February 26, 2025, to resolve the disputes of fact and the question of bad faith. John Sawicki testified for the defense as an expert in forensic computer science and forensic digital examination. He explained that he received reports of extraction data from two mobile devices, an iPhone and an Android. The iPhone report he reviewed contained no application data, which is very unusual, nor call logs or text messages, only images. One of the images was a "screen reporting," a screenshot from the date the phone was recovered from Y.H., which showed notifications for the application Snapchat—indicating that Snapchat was indeed installed on the device. The Android report, on the other hand, contained call logs, text messages, and application data. Sawicki concluded that a full extraction was not performed on the iPhone. He also testified that the iPhone did not appear to have a sim card in it or a connection to a cellular network.

Two Tampa police detectives testified for the prosecution. Detective Tony Aguiar, an FBI task force officer and a detective assigned to the Special Victims Unit, interviewed Y.H. on the night of Gardner's arrest. He testified that he did not think it was necessary to conduct extractions of her cell phones to obtain evidence about the Gardner case, because she had told him she did not communicate with Gardner by phone, and the police had already obtained a video of Gardner that she took on her phone. However, secondary to his investigation into the Gardner case, he was concerned about Y.H.'s circumstances and family life that led to her being picked up by a stranger late at night by herself and brought to a hotel. Because investigations of

child abuse and neglect are within his purview as a Special Victims Unit detective,[1] he testified, he obtained consent from Y.H. and her mother to download the contents of her phones, with the agreement that the phones would be returned as soon as possible. Detective Aguiar stated that he followed normal procedures when requesting digital forensic examination of the phones. He informed the examiner that there was nothing specific that he needed from the phones, and that it was a standard examination of a victim's phone with her consent. He did not discuss the specifics of the investigation with the examiner, nor direct or limit the examination request in any way. When Aguiar was notified that the extractions were complete, he contacted Y.H.'s mother to arrange for the return of the phones. He returned the phones on December 14, 2023, and reviewed the extractions on December 15, 2023. He did not attempt to obtain any data from Y.H.'s social media accounts.

Detective Benjamin Bors was the digital forensic examiner of Y.H.'s phones. He testified that he fulfilled Aguiar's request for an "advance logical extraction" of both phones, which is the standard type of extraction for live victim cases. He did not limit the extractions in any way or vary from his normal procedure in conducting them. In addition, nothing about the extractions indicated they were incomplete or unsuccessful. However, he explained that advance logical extractions do not always extract phone applications or their contents when the contents are kept on a server

---

[1] Detective Aguiar also testified that he had been aware of Y.H. before that night, as a runaway juvenile with a difficult family dynamic who was involved in prostitution, but that he had never personally interviewed her before.

rather than on the device, particularly when the phone is not connected to a cellular or wifi network. Bors sometimes performs "full file system extractions," which are more likely to capture data from third party applications (though it is still not guaranteed), but he usually does that type of extraction in homicide or search warrant cases, rather than cases with a live victim who consented.

It became clear during the witness testimony that the Government had not turned over, nor had the defense requested, the raw data from the phone extractions. Accordingly, the Court directed the Government to disclose the raw data if it was still in the possession of the police. The parties arranged for Sawicki to meet with Detective Bors to review it. Doc. 193. Based on Sawicki's review, Gardner now appears to acknowledge that the police did not limit the extraction that they performed; instead, he asserts that Y.H. must have deleted social media applications and other material from the iPhone before the police performed the extraction, just as she deleted certain photographs taken in Gardner's hotel room on the night of the incident. Doc. 195.[2] It is possible that a full file system extraction could reveal certain data from the deleted applications, such as usernames and profiles, that might allow him to obtain a subpoena from the application companies. *Id.* However, a full file system extraction is unavailable due to the Government's failure to retain possession of the phones. *Id.*

---

[2] The iPhone extraction report contains thumbnails of several selfie photographs of Y.H. taken in a bathroom at approximately 1:20 AM on November 17, 2023, which is the time when she was in Gardner's hotel room. Doc. 192-2. The report indicates that all but one of these photos were deleted at approximately 7:30 AM the same day, although the photos remained in the device's trash folder. *Id.*

Gardner contends that "evidence of Y.H's attempts to obstruct the investigation is highly relevant to Y.H.'s conduct that night[.]" *Id.* at 2.  He maintains that Detective Aguiar's decision to return the phones before even reviewing the extraction data demonstrates his bad faith. *Id.*

The Government argues the hearing produced no evidence of bad faith, because Aguiar had no knowledge that there was any relevant information on Y.H.'s phones, including anything exculpatory or potentially useful to the defense, at the time he returned them to her.  The Government also points out that the material Y.H. deleted remains available in the trash folder.  To the extent there is any missing information, the Government argues it would be cumulative of what Gardner already possesses.

## B. Discussion

The Due Process Clause of the Fourteenth Amendment requires the government to preserve material evidence that "might be expected to play a significant role in [a] suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984).  Such evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.  The failure to preserve evidence that is only "potentially useful" does not violate due process unless the defendant "can show bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  But where the government fails to disclose

"material exculpatory evidence," the question of bad faith is irrelevant. *Illinois v. Fisher*, 540 U.S.  544, 548 (2004), citing *Brady v. Maryland*, 373 U.S. 83 (1963).

Here, because it is unknown whether any unpreserved phone data is "material exculpatory evidence," Gardner cannot prove a *Brady* violation.  His motion to dismiss on *Brady* grounds is therefore due to be denied.

With respect to the failure to preserve claim, the Court agrees that Gardner has satisfied the lower standard of demonstrating that additional phone data is "potentially useful" to his defense. *Youngblood*, 488 U.S. at 58.  However, he has not made the necessary showing that law enforcement acted with bad faith.  Many of the arguments in Gardner's written motion attempt to demonstrate bad faith on the part of the U.S. Attorney's Office—but because he contends that it was the Tampa Police Department that failed to preserve the evidence, he must prove bad faith on the part of the police.

As noted, Gardner no longer asserts that the police limited the extraction of Y.H.'s phones.  To the extent he argues that the fact that they performed an advance logical extraction rather than a full file system extraction demonstrates bad faith, he has not presented evidence to refute the credible testimony that they adhered to standard procedure when doing so.  He now focuses his arguments on the fact that Aguiar returned the iPhone to Y.H. before he reviewed the extraction report.  However, this does not demonstrate bad faith.  On the contrary, it demonstrates that Aguiar was apparently unaware that Y.H. had deleted anything from her phone when he returned it, and he had no reason to deviate from standard procedure.  Gardner has also not refuted Aguiar's testimony that he was not looking for material related to the

Gardner case when he requested the extraction. The Court is further persuaded by the fact that the raw data from the extraction was preserved and was able to be reviewed by the defense.[3] In all, Gardner has not demonstrated the existence of bad faith by the police department. The motion to dismiss on due process grounds is due to be denied.

Accordingly, it is **ORDERED**:

1. Defendant's Motion to Dismiss (Selective Prosecution) (Doc. 160); Motion to Disqualify (Doc. 161); and Motion to Dismiss (Spoliation) (Doc. 162) are **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida on April 11, 2025.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[3] Indeed, at the hearing, Gardner requested dismissal of the indictment, or to receive the raw data "in the alternative" to dismissal.